In re **ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite and Chemetron Corporation, Debtors.**

**Civ. A. Nos. 89–1893, 89–1894.**

United States District Court, W.D. Pennsylvania.

July 31, 1990.

Gary Blum, New York City, for Equity Committee.

Bruce McCullough, et al., Pittsburgh, Pa., for Sunbeam & Allegheny Intern.

Lorie Beers, Pittsburgh, Pa., for Official Committee of Unsecured Creditors of A.I.

## MEMORANDUM OPINION

BLOCH, District Judge.

### I. Facts

On February 20, 1988, Allegheny International, Inc. (AI) and four of its subsidiaries filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. On May 3, 1988, fourteen other subsidiaries of AI filed for relief.

On July 25, 1989, AI filed a motion with the bankruptcy court seeking approval of the terms and conditions of a commitment letter issued by Wells Fargo Bank (Wells Fargo) to AI, and seeking permission to pay commission fees to Wells Fargo as administrative expenses pursuant to Bankruptcy Code § 503(b). On the same date, Sunbeam Corporation (Sunbeam), an AI subsidiary, filed a revised motion requesting that the bankruptcy court authorize Sunbeam to retain James D. Milligan (Milligan) pursuant to a special advisor agreement. AI also filed a motion for expedited consideration in which it requested that the bankruptcy court give expedited treatment to the motions to pay Wells Fargo and employ Milligan because the commitment letter was not effective, according to its terms, unless the two motions were both approved by the bankruptcy court on or before August 4, 1989.

On August 3, 1989, the bankruptcy court held a joint hearing on the two motions. Following this hearing, the bankruptcy court entered its order authorizing AI to enter into and perform its obligations under the Wells Fargo commitment letter, but reserved its right to examine the reasonable of Wells Fargo's due diligence expenses. *In re Allegheny International, Inc.*, Bankr. No. 88–448, 90–124547 (August 3, 1989). The bankruptcy court also entered its order authorizing Sunbeam to retain Milligan as a special advisor and pay Milligan compensation pursuant to the amended special advisor agreement. *In re Sunbeam Corp.*, Bankr. No. 88–448, 90–124546 (August 3, 1989).

Presently before this Court are appeals by the Equity Security Holders of Allegheny International, Inc. (Equity Committee) challenging the order authorizing and approving retention and compensation of Milligan pursuant to the special advisor agreement (Milligan order) and the order authorizing the debtor to enter into and perform obligations under the Wells Fargo commitment letter (Wells Fargo order). This Court must also consider Sunbeam's motion to dismiss the Equity Committee's appeal of the Milligan order.

### II. Standard of review

Under Bankruptcy Rule 810, a bankruptcy court's findings of fact may be reversed, modified or remanded with instructions for further proceedings by a district court only upon a determination that the findings of fact are clearly erroneous. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 n. 6 (3d Cir.1981); *In re Meade Land & Development Co., Inc.*, 527 F.2d 280, 283 (3d Cir.1975). Questions of law are not subject to the clearly erroneous standard; instead, the district court must make an independent determination of the legal issues. *Universal Minerals, id.; Meade Land,* 527 F.2d at 282–83.

### III. Jurisdiction

As a preliminary matter, this Court must examine its jurisdiction over these appeals. The Equity Committee brings these appeals pursuant to 28 U.S.C. § 158(a), which provides that district courts may review appeals from final judgments, orders and decrees of bankruptcy judges, and with leave of court, interlocutory orders and decrees of bankruptcy judges. No motion has been filed seeking leave of court for appeal jurisdiction pursuant to Bankruptcy Rule 8001(b). The appellee contends that appellant has not established a jurisdictional basis for its appeal because the order at issue lacks the requisite finality. Therefore, the Court will first consider whether automatic jurisdiction exists.

The Court of Appeals for the Third Circuit has interpreted finality pragmatically in bankruptcy cases, and has permitted review of orders that are considered interlocutory in other context. *See In re Brown,* 803 F.2d 120, 122 (3d Cir.1986); *In re Ama-*

*tex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985). By allowing parties to appeal discrete issues within a single bankruptcy proceeding, the Third Circuit has sought to avoid the waste of resources that would result from insisting upon the completion of the proceedings prior to any appeal. *Brown*, 803 F.2d at 122.

The Third Circuit utilized this pragmatic interpretation of finality in *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99 (3d Cir.1988). In *F/S Airlease*, the Third Circuit held that orders of the bankruptcy and district courts, which authorized the debtor to retain a broker pursuant to § 327(a) of the Bankruptcy Code, were final and appealable. The Third Circuit stated:

> The factors that we have considered in making a decision on finality have included the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered.

*F/S Airlease*, 844 F.2d at 104. The Court found that the order would have a significant impact on the assets of the bankruptcy estate and that treating the order as final would serve the interests of judicial economy by obviating the need for further action by the bankruptcy court. *Id.*

█ Applying the *F/S Airlease* test to the instant case, this Court is persuaded that the Wells Fargo order was a final, appealable order. First, the Wells Fargo order has a substantial affect upon the assets of the debtor's estate. The Wells Fargo order requires AI to pay underwriting and commitment fees to Wells Fargo in excess of $1 million and also to fund Wells Fargo's due diligence. Second, by ruling on the Wells Fargo order, the Court will further judicial economy by eliminating the need for further action on this particular issue in the bankruptcy court.

█ *F/S Airlease* also persuades this Court that the Milligan order is a final order. The Milligan order also has a substantial effect upon the assets of the debtor's estates. The Milligan order requires Sunbeam to pay Milligan $250,000 for three months of service, and also contemplates

the retention of Milligan as chief executive officer and chairman of the board of directors of the reorganized debtors. Furthermore, this Court's ruling on the propriety of the Milligan order at this time will preclude further action in the bankruptcy court on this issue. Having determined that jurisdiction exists over these appeals, the Court next turns to the Wells Fargo order and the Milligan order.

## IV. Wells Fargo order

### A. Plan Confirmation Requirements

█ The Equity Committee argues that the commitment letter which AI entered into with Wells Fargo impermissibly circumvents the plan confirmation requirements of the Bankruptcy Code, 11 U.S.C. §§ 1121–29, because it dictates the terms of AI's plan of reorganization. The Equity Committee cites *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir.1983), for the rule that a debtor may not enter into a contractual agreement which contains the elements of a plan of reorganization without complying with the Code's plan confirmation requirements. *Braniff*, however, is not controlling in the instant case.

In *Braniff*, the bankruptcy and district courts approved an agreement proposed by Braniff whereby it would transfer certain of its assets to another airline pursuant to § 363(b) of the Bankruptcy Code. Under the agreement, Braniff was to receive travel coupons to be used only in a future Braniff reorganization. The agreement also required the secured creditors to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors. In reversing the bankruptcy and district courts, the Fifth Circuit stated that the proposed agreement not only changed the composition of Braniff's assets, but "also had the practical effect of dictating some of the terms of *any* future reorganization plan." *Id.* at 940 (emphasis added). The Court observed that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization

plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *Id.*

In the instant case, the commitment letter contains certain terms which might dictate the terms of a future plan of reorganization, but the commitment letter does not dictate the terms of *any* plan of reorganization. If the plan ultimately proposed by AI is not acceptable to the creditors, the creditors may reject it. AI's creditors will still be afforded the rights provided under the Bankruptcy Code regarding the issues of disclosure, voting and priority. Therefore, the Wells Fargo commitment letter did not violate the Bankruptcy Code's procedures for confirming a plan of reorganization.

### B. Administrative Expenses

In its August 3, 1989 order approving the AI–Wells–Fargo commitment letter, the bankruptcy court authorized AI to pay Wells Fargo all due diligence expenses the latter incurred, as well as commitment and agent's fees as provided under the terms of the commitment letter. The bankruptcy court treated these expenses as administrative claims pursuant to 11 U.S.C. § 503(b)(1)(A), which provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses ... including ... the actual, necessary costs and expenses of preserving the estate." The Bankruptcy Code defines "after notice and a hearing" as "such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). The Equity Committee argues that the bankruptcy court should have held an evidentiary hearing to determine the value of the commitment letter to the bankruptcy estate. AI argues that § 102(1)(A) gave the bankruptcy court discretion not to conduct an evidentiary hearing.

An administrative expense may not be allowed absent a finding that the expense is necessary to the preservation of the estate. *In re Club Dev. & Management Corp.*, 27 B.R. 610, 612 (9th Cir. Bankr.1982); *In re Rhymes, Inc.*, 14 B.R. 807, 808 (Bankr.D.Conn.1981). Such expenses much yield a "demonstrable" benefit to the estate, creditors and stockholders. *In re Paolino*, 71 B.R. 576, 580 (Bankr.E.D.Pa.1987); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 569 (Bankr.D.Utah 1985). Section 102(1)(A), however, does not expressly require an evidentiary hearing. Here, the bankruptcy court hearing satisfied § 102(1)(A)'s requirement of "such opportunity for a hearing as is appropriate in the particular circumstances, particularly in light of the pressing need for bankruptcy court approval of the commitment letter." Various constituencies made known their opposition to the proposed financing agreements, oral arguments were heard by the bankruptcy court, and the bankruptcy court had access to opposing counsel's written objections to AI's motion. The bankruptcy court also reserved the right to examine the reasonableness of expenses. This Court finds that the hearing before the bankruptcy court satisfied the requirements of § 102(1)(A).

### C. Breach of Fiduciary Duties

The Equity Committee next argues that enforcement of the commitment letter is a breach of AI's fiduciary duty under the Bankruptcy Code because it places an undue burden on the estate. As the Equity Committee notes, § 363(b) of the Bankruptcy Code provides that a trustee may, after notice and a hearing, use, sell or lease, other than in the ordinary course of business, property of the estate. The Equity Committee then argues that AI seeks to use the cash of the estate pursuant to the terms of the commitment letter, but has not articulated a business reason for doing so. It is clear from this argument that the Equity Committee is not asserting an argument based upon breach of fiduciary duty; instead, the Equity Committee asserts that AI and the bankruptcy court have not complied with § 363(b).

In *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir.1983), the Second Circuit held that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an applica-

tion." The record on appeal reveals that AI articulated the need for financing and provided the bankruptcy court with relevant information regarding the loan and the necessity for it. The bankruptcy judge, therefore, could and did find that there was a good business reason for use of the assets.

## D. Enforceability of the Agreement

■ The Equity Committee contends that the commitment letter is unenforceable because it only established a framework within which AI and Wells Fargo might negotiate concrete financing arrangements. Although the financial community commonly uses commitment letters to outline the structure of loan agreements, commitment letters are not always found to be binding contracts. *See Dunhill Sec. Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 198 (S.D.N.Y.1969); *Beaumont v. American Can Co.,* 621 F.Supp. 484, 493 (S.D.N.Y.1985), *aff'd.,* 797 F.2d 79 (2d Cir.1986).

The Equity Committee argues that *Teachers Ins. and Annuity Association v. Tribune Co.,* 670 F.Supp. 491, 499 (S.D.N.Y.1987), compels this Court to conclude that the Wells Fargo commitment letter is not binding. *Teachers,* however, compels the opposite conclusion. In *Teachers,* the Court held that a commitment letter represented a binding preliminary commitment which obligated both sides to negotiate in good faith to conclude a final loan agreement. 670 F.Supp. at 499. "In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is ... to determine the intention of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached." *Id.*

As in *Teachers,* this Court first looks to the language of the commitment letter for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities. The commitment letter evinces an intent to be bound. The letter states that "[i]f you accept and agree to this proposal,

please so indicate by signing in the space provided below and returning a copy of this letter to us." In signing, AI used the words "Accepted and Agreed to." The Equity Committee argues that the agreement was not binding because it contained language reserving the rights of approval and establishing conditions to be fulfilled prior to approval. "Such terms are by no means incompatible with intention to be bound." *Teachers,* 670 F.Supp. at 500. "[S]uch reservations may clear the right of a party ... to insist on appropriate documentation and to negotiate for a demand or demand protections which are customary for such transactions." *Id.* This Court thus concludes that the Wells Fargo commitment letter was a binding preliminary commitment.

## E. Advancement of the Case

■ The Equity Committee also argues that approval of the commitment letter was premature because it was unclear whether the commitment letter advanced the progress of the case. *See In re Paolino,* 71 B.R. 576, 580 (Bankr.E.D.Pa.1987) (request for administrative expenses premature where court was unclear that claimant's action advanced the progress of the case). Although an AI/Milligan plan had not been filed before the court approved the commitment letter, approval of the commitment letter provided a major incentive for serious negotiations with creditors regarding consensual confirmation of the proposed reorganization plan, and provided reason to believe that the plan was financable and thus confirmable. This Court finds that the commitment letter advanced the progress of the case.

## V. *Milligan order*

### A. Mootness

Before addressing the merits of AI's appeal of the Milligan order, this Court must first address Sunbeam's motion to dismiss the appeal as moot. Sunbeam contends that the appeal is moot because Milligan has completed his duties and obligations under the terms of the amended special advisor agreement and because Sunbeam

has performed its obligations by paying Milligan for his services. The Equity Committee contends that the appeal is not moot because Milligan has not completed all of his duties and obligations under the terms of the amended special advisor agreement, and because any payments which have already been paid to Milligan can be returned to Sunbeam should this Court reverse the bankruptcy court's order.

■ When reviewing a claim that an issue has become moot, this Court is constrained by the "case or controversy" requirement of Article III of the Constitution. *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). Absent a presently existing dispute between the parties, a federal court is without jurisdiction to adjudicate a dispute. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). The Third Circuit has recognized "in the context of bankruptcy proceedings, that '[g]enerally, an appeal will be dismissed as moot when events occur during the pendency of the appeal which prevent the appellate court from granting any effective relief.'" *In re Highway Truck Drivers & Helpers Local 107*, 888 F.2d 293, 297 (3d Cir.1989) (*quoting In re Cantwell*, 639 F.2d 1050, 1053 (3d Cir. 1981).

■ Although Sunbeam and Milligan have fulfilled their obligations under the special advisor agreement,[1] the appeal of the Milligan order is not moot. This Court is not prevented from granting any effective relief in this matter. Should this Court reverse the Milligan order, the Court may order the return of all or a portion of the monies paid by Sunbeam to Milligan. Sunbeam essentially suggests that a district court should be prevented from reviewing a bankruptcy court order whenever the bankruptcy estate has paid monies before the district court has the opportunity to review the bankruptcy court's order.

Sunbeam's stringent interpretation of mootness is at odds with *In re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.1986) (where all of the assets of bankruptcy estate were sold before appellate review, Third Circuit remanded for evidentiary hearing to determine that outcome of appeal could not effect legal interests of the parties). Moreover, in protracted bankruptcy litigation like the instant proceedings, such an interpretation would effectively remove from district court review many appeals over which a district court would otherwise properly assert jurisdiction.

**B. Bankruptcy Code Requirements**

*1. Disinterestedness*

■ Having concluded that the appeal of the Milligan order is not moot, the Court now turns to the merits of the Equity Committee's appeal. The Equity Committee first contends that Milligan's employment is improper under § 327(a) of the Bankruptcy Code because Milligan is not a "disinterested person." Section 327(a) provides:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). The Bankruptcy Code defines "disinterested person" as one who:

> does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or

1. Sunbeam's contention that Milligan is still performing obligations pursuant to the agreement is not borne out by the express terms of the agreement. The term of the agreement commenced as of June 1, 1989 and continued until September 1, 1989. (Agreement ¶ 6). Upon termination of the agreement, all obligations of the

parties to each other ceased with the exception of Sunbeam's obligations to pay Milligan any portion of the fee not yet paid, to reimburse Milligan for any expenses incurred prior to termination, and to indemnify Milligan. *Id.* Milligan's obligation of confidentiality survived termination of the agreement. *Id.*

interest in, the debtor or an investment banker ... or for any other reason.

11 U.S.C. § 101(13)(E).

The definition of "disinterested person" is adapted from § 158 of Chapter X of the Bankruptcy Act of 1898. Under § 158, a trustee had to "be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 333 (E.D.Pa.1982) (*quoting In re Realty Associates Securities Corp.*, 56 F.Supp. 1007 (E.D.N.Y. 1944)). The purpose of the disinterestedness requirement is the avoidance of associations or connections, whether direct or indirect, between potential employees of a trustee or debtor-in-possession, which could introduce conflicting loyalties into the bankruptcy case. *Id.* The disinterestedness requirement is intended to avoid not only actual conflicts of interest, but also the appearance of conflicts. *In re Paolino*, 80 B.R. 341, 344 (Bankr.E.D.Pa.1987); *In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982).

When the Equity Committee suggests that Milligan was not disinterested because he was "an essential component" of the DLJ agreement, it refers to the fact that Donaldson, Lufkin & Jennette Securities Corporation (DLJ) made funding of its reorganization plan contingent upon Milligan's employment by the reorganized debtors. DLJ and other potential investors have apparently thought highly of Milligan's managerial skills and have sought to include him in the management of a reorganized AI. Nevertheless, the possibility that Milligan may eventually play a managerial role in an as-yet speculative reorganization plan does not mean that Milligan would fall prey to conflicting loyalties while employed under the special advisor agreement, or that his interest would be materially adverse to those of the estate, creditors or equity security holders. AI informed the bankruptcy court that notwithstanding the prior affiliation of Milligan with DLJ, no continuing duty was owed to DLJ by Milligan. The Equity Committee also contends that Milligan is not disinterested because AI has commenced an adversary proceeding against DLJ seeking to void all agreements and requesting sanctions and damages. Milligan, however, was not individually named as a respondent to the motion or a defendant in that lawsuit. His involvement with DLJ's proposal was not high enough to constitute an interest materially adverse to the estate.

*2. Evidentiary Hearing*

The Equity Committee contends that the bankruptcy court was required to consider evidence prior to approving the retention and compensation of Milligan under the amended special advisor agreement. The Bankruptcy Code does not impose an obligation upon the bankruptcy court to hold an evidentiary hearing prior to approving the appointment of a "professional person." The Bankruptcy Code provides that "the trustee, with the court's approval, may employ one or more ... professional persons...." 11 U.S.C. § 327(a). The purpose of this requirement is to have the Court oversee the appointment of an additional employee that the trustee or debtor-in-possession deems will benefit the administration of the estate. *See In re Edmund L. Yeisley*, 64 B.R. 360, 362 (Bankr.S.D.Tex.1986) (policy reasons for requirement of court approval include cost control, provisions for an opportunity for objection to unnecessary expenditures and avoidance of duplicative services and costs); *In re First Federal Corp.*, 43 B.R. 388, 389 (Bankr.W.D.Va.1984) (payment of professionals where funds are to be paid from the estate is the responsibility of court).

Bankruptcy Rule 2014(a) provides the proper procedure for the appointment of a "professional person" pursuant to § 327(a):

An order approving the employment of ... professionals pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for his selection, the professional services to be rendered, any proposed

arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants.

In its original motion and revised motion, Sunbeam provided the bankruptcy court with sufficient information to satisfy the requirements of § 2014(a). Sunbeam also attached the amended special advisor agreement to its revised motion. No further evidentiary hearing was required by § 327(a).

### 3. Award of Compensation

The Milligan order states that "[t]he Debtor is authorized to pay to James D. Milligan the compensation, which is hereby deemed reasonable compensation." The Equity Committee asserts that the order was entered in violation of § 330 of the Bankruptcy Code and Bankruptcy Rule 2016. Sunbeam asserts that its motion was presented pursuant to §§ 327 and 328,[2] that the order satisfies § 328, and that § 330 is inapplicable. The Court must, therefore, first ascertain which section and/or rule of the Bankruptcy Code governs the procedure by which a bankruptcy court authorizes a debtor to pay compensation to a professional person. A review of § 328 and § 330 persuades the Court that § 330 governs the situation where, as in the instant case, a debtor moves a bankruptcy court to award compensation to a professional person. The Court is also persuaded that Bankruptcy Rule 2016[3] does not govern the Milligan order. The order authorizes the debtor to pay compensation to Milligan. Bankruptcy Rule 2016, however, prescribes the requisite form of an application for compensation or reimbursement from estate funds. Since Bankruptcy Rule 2016 would govern the proceeding

after the court authorized the award of compensation, the Equity Committee's argument is premature.

Section 330 requires that notice to any parties in interest and a hearing precede an award of compensation. The Equity Committee does not dispute that notice and a hearing preceded the bankruptcy court's award of compensation, but asserts that the bankruptcy court did not determine the reasonableness of the compensation to be paid to Milligan. The bankruptcy court is charged with the responsibility of determining the reasonableness of compensation and reimbursement. *In re R & B Institutional Sales, Inc.,* 65 B.R. 876, 880 (Bankr.W.D.Pa.1986); *Matter of Affinito & Son, Inc.,* 63 B.R. 495, 497 (Bankr.W. D.Pa.1986). This Court finds that the bankruptcy court properly determined the reasonableness of Milligan's compensation after holding a hearing on the matter. The bankruptcy court was familiar with Milligan's background and abilities. Through its involvement in these ongoing proceedings, the bankruptcy court was familiar with the industry and with compensation for employees in the industry. Furthermore, the special advisor agreement spanned a relatively brief period of time and enumerated Milligan's duties during that time. These factors provided the bankruptcy court with adequate information from which it could adduce the reasonableness of the proposed compensation.

### 4. Plan Confirmation Requirements

The Equity Committee also contends that the employment of Milligan constituted an impermissible shaping of a plan of reorganization. "The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter

2. Section 328 provides:
   (a) The trustee, or a committee appointed under § 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under § 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis.
   11 U.S.C. § 328.

3. Bankruptcy Rule 2016 provides:
   An entity seeking interim or final compensation for services, or reimbursement, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested....

11 for confirmation of the plan *sub rosa.*" *In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (5th Cir.1983). In *Braniff Airways,* the Fifth Circuit found that a proposed agreement short circuited Chapter 11's requirements because it "had the practical effect of dictating some of the terms of any future reorganization plan." *Id.* The hiring of Milligan did not have the same repercussions. Although Milligan was retained to assist the debtors in developing their plan and in raising debtor financing, his employment did not have the practical effect of dictating some of the terms of *any* future reorganization plan. The Equity Committee correctly observes that any monies which might ultimately be advanced by Wells Fargo were to be used only to fund an "AI/Milligan Plan." However, as this Court has previously noted, AI's creditors will still be afforded the rights provided under the Code if the parties eventually enter into the commitment letter. Therefore, the employment of Milligan did not constitute an impermissible shaping of a plan of reorganization.

For these reasons, Sunbeam's motion to dismiss the Equity Committee's appeal is denied, and this Court affirms the bankruptcy court's orders authorizing and approving the special advisor agreement and compensation of James D. Milligan pursuant to the terms of the special advisor agreement and authorizing the debtor to enter into and perform its obligations under the commitment letter with Wells Fargo Bank.

An appropriate Order will be issued.